# Potential Litigation Between the Department of Labor and the United States Postal Service

The Attorney General has authority under 39 U.S.C. § 409(g)(2) to allow the United States Postal Service to direct its own defense of a suit filed against it by the Department of Labor, alleging that USPS has violated a whistleblower provision of the Occupational Safety and Health Act of 1970.

USPS may contract with private counsel to conduct the litigation on USPS's behalf, consistent with the Appointments Clause.

If the Attorney General opts to allow USPS to direct its own defense, the suit will fall within the constitutional authority of the Article III courts.

October 26, 2011

MEMORANDUM OPINION FOR THE
ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

The Department of Labor ("DOL") has asked the Attorney General for permission to file suit against an employer that DOL believes has violated a whistleblower provision of the Occupational Safety and Health Act of 1970 ("OSHA"), Pub. L. No. 91-596, § 11(c), 84 Stat. 1590, 1603 (1970). This request is consistent with 29 U.S.C. § 663 (2006), which authorizes the Solicitor of Labor to litigate civil actions under OSHA, but makes that authority "subject to the direction and control of the Attorney General." The twist in this case is that the employer is the United States Postal Service ("USPS"). The suit that DOL wishes to bring would therefore pit one agency of the federal government against another.

You asked us to address two questions relevant to DOL's request. The first question arises because the Attorney General has statutory authority to supervise the litigation conduct of both DOL and USPS in suits of this kind. As a result, unless the Attorney General may validly cede that authority to one agency or the other, he would oversee both the plaintiff and the defendant in the proposed litigation. You have therefore asked whether the Attorney General may authorize USPS to conduct its own defense, independent of his direction and control, in order to address this potential conflict of interest. *See* Memorandum for Caroline Krass, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Tony West, Assistant Attorney General, Civil Division at 2, 6 (May 1, 2011) ("Opinion Request"). Your second question, *see id.* at 4–5, is

whether, in the circumstances presented here, the proposed inter-agency whistleblower suit would be a "Case[]" or "Controvers[y]" that is within the "judicial Power" of an Article III court to resolve. U.S. Const. art. III, § 2.

We conclude, first, that the Attorney General has authority under 39 U.S.C. § 409(g)(2) (2006) to allow USPS to direct its own defense of this case, and that the exercise of this authority would not raise concerns under the Appointments Clause. Second, if the Attorney General opts to allow USPS to direct its own defense,[1] we conclude that this suit would fall within the constitutional authority of the Article III courts. The Supreme Court and opinions of this Office have explained that suits between components of the Executive Branch may be resolved by Article III courts where, as here, the claim at issue is of a kind that courts traditionally resolve, and where the requirement of concrete adverseness would be met. This case would involve an unlawful termination claim by a whistleblower, standard fare for federal courts. In addition, in the proposed litigation, DOL would represent the interests of a private individual who has a concrete dispute with USPS, an "independent" agency with a governing board that has a degree of insulation from Presidential direction and control.[2]

---

[1] We understand that the Department is not currently considering the option of authorizing DOL to file the proposed suit *and* supervising both parties to the dispute. *See* Opinion Request at 13 (describing that scenario as presenting "an untenable conflict"). We therefore do not address the distinct justiciability question that would be presented by an inter-agency suit in which the Attorney General controlled the litigation conduct of both federal agencies.

[2] We have also considered whether presenting this dispute to a court would impermissibly interfere with the President's Article II authority to supervise the Executive Branch—a question we have often addressed in tandem with justiciability questions presented by potential intra-branch litigation. *See, e.g., Administrative Assessment of Civil Penalties Against Federal Agencies Under the Clean Air Act*, 21 Op. O.L.C. 109, 115–18 (1997) ("*EPA Enforcement*"). We conclude that it would not. Generally, a statute does not violate Article II merely by *authorizing* judicial resolution of an inter-agency dispute. Rather, "[t]he critical point for constitutional purposes is that the [statute] does not preclude the President from authorizing any process he chooses to resolve" such a dispute. *Id.* at 116 (citing *Constitutionality of Nuclear Regulatory Commission's Imposition of Civil Penalties on the Air Force*, 13 Op. O.L.C. 131, 136–37 (1989)) ("*NRC Enforcement*"). Here, the relevant statutes do not require DOL to file suit, and they subject DOL's litigating authority to the direction and control of the Attorney General. Thus, the President, through the Secretary of Labor and Attorney General, retains control

## I.

DOL alleges that USPS discharged one of its employees after she filed a complaint with the Occupational Safety and Health Administration concerning environmental conditions at her workplace. *See* Opinion Request at 1. DOL contends that this discharge violated section 11(c) of OSHA, 29 U.S.C. § 660(c) (2006), which in relevant part makes it unlawful for an employer to "discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter." Our understanding is that USPS disagrees with this conclusion. *See* Opinion Request at 1–2 (noting that the Civil Division's attempts to mediate the dispute thus far have not succeeded).

Under section 11(c), "[a]ny employee who believes that he has been discharged or otherwise discriminated against by any person in violation of this subsection may, within thirty days after such violation occurs, file a complaint with the Secretary [of Labor] alleging such discrimination." 29 U.S.C. § 660(c)(2) (2006). If the Secretary determines that provision has been violated, she is authorized to "bring an action in any appropriate United States district court against such person." *Id.* The district court may grant injunctive relief against the employer if the Secretary prevails, and may "order all appropriate relief including rehiring or reinstatement of the employee to his former position with back pay." *Id.* Section 11(c) does not expressly create a private right of action, and the courts that have addressed the question appear to be in agreement that it does not do so implicitly. *See, e.g.*, *George v. Aztec Rental Ctr., Inc.*, 763 F.2d 184, 186–87 (5th Cir. 1985); *Taylor v. Brighton Corp.*, 616 F.2d 256, 258–64 (6th

---

over whether a suit against USPS will be filed and how such a suit will be conducted. Of course, USPS is "an *independent* establishment of the executive branch of the Government of the United States," 39 U.S.C. § 201 (2006) (emphasis added), and the President has limited authority to remove members of the Postal Service's Board of Governors. *See* 39 U.S.C. § 202(a)(1). These statutory restrictions on removal limit the President's ability to direct the decisions of the Service's Board of Governors, including its litigation decisions. But it is the fact that Congress created an "independent" Postal Service that constrains the President's authority to resolve this inter-agency dispute, *not* the fact that Congress has authorized DOL to bring suit against USPS. Indeed, Congress's grant of authority to DOL and the Attorney General to sue USPS to ensure that USPS complies with OSHA does not diminish the President's authority over USPS, but instead provides him with an additional tool to resolve any dispute with USPS regarding its legal obligations under OSHA.

Cir. 1980). Accordingly, a discharged USPS employee may obtain judicial relief under section 11(c) only if DOL sues on her behalf.

Prior to 1998, USPS was not subject to suit under this provision. Although section 11(c) protects "any employee," that phrase is not as all-encompassing as it first appears. This is because OSHA defines "employee" to mean an "employee of an employer," *see* 29 U.S.C. § 652(6) (2006), and, from its inception, has exempted certain *employers* from OSHA's reach. Among other exceptions, OSHA originally provided that "[t]he term 'employer' . . . does not include the United States or any State or political subdivision of a State." *See* 29 U.S.C. § 652(5) (1970).[3]

In 1998, however, Congress enacted the Postal Employee Safety Enhancement Act, Pub. L. No. 105-241, 112 Stat. 1572 (1998). The Act's preamble states that the law was intended "to make [OSHA] applicable to the United States Postal Service in the same manner as any other employer." *Id.* To that end, Congress amended OSHA's definition of "employer" to remove USPS from the exception it created for the United States. *Id.* § 2(a) (employer "does not include the United States (*not including the United States Postal Service*)") (emphasis added)) (codified at 29 U.S.C. § 652(5) (2006)). As the statutory text now reads, therefore, USPS is no longer excluded from the class of "employer[s]" who are subject to OSHA and to OSHA enforcement actions.

The legislative history of the 1998 Act confirms that Congress intended to make USPS subject to OSHA enforcement actions. For example, Senator Enzi, a co-sponsor of the Act, stated that the changes would "bring the Postal Service under the full jurisdiction of the Occupational Safety and Health Administration," and in doing so "permit[] OSHA to fully regulate the Postal Service the way it does private businesses." 144 Cong. Rec. 18,364 (1998). Similarly, Senator Kennedy, also a co-sponsor, explained that although President Carter had by Executive Order "directed federal agencies to comply with all OSHA safety standards, and . . . authorized

---

[3] Congress instead addressed the need for increased safety in federal workplaces by directing "the head of each Federal agency to establish and maintain an effective and comprehensive occupational safety and health program which is consistent with the standards promulgated" with respect to private workplaces. OSHA § 19(a), 84 Stat. at 1609. Several executive orders have also adopted measures, consistent with OSHA, to address the need for safety in federal workplaces. *See, e.g.*, Exec. Order No. 11807 (Sept. 28, 1974), 3 C.F.R. 897 (1975); Exec. Order No. 12196 (Feb. 26, 1980), 3 C.F.R. 145 (1981).

OSHA to inspect workplaces and issue citations for violations," the order had not provided OSHA with "authority to seek enforcement of its order in court, and it cannot assess a financial penalty on the agency to obtain compliance." *Id.* at 18,365. Senator Kennedy explained that the bill would "permit[] OSHA to issue citations for safety hazards, and back them up with penalties. This credible enforcement threat will encourage the Postal Service to comply with the law." *Id.* Discussion in the House of Representatives, which voted several weeks later to adopt the bill passed by the Senate, was to the same effect. *See, e.g., id.* at 20,199–200 (remarks of Congressman Goodling); *id.* at 20,200–201 (remarks of Congressman Martinez).

In sum, when Congress made OSHA "applicable to the United States Postal Service in the same manner as any other employer," Pub. L. No. 105-241 pmbl., 112 Stat. at 1572, it intended to authorize DOL to bring suits against USPS in circumstances where it could bring suit against another covered employer.[4] OSHA enforcement actions give rise to litigation in Article III courts in at least two ways. First, when an "employer" is cited for violating OSHA standards, it may seek administrative review of DOL's determination before the Occupational Safety and Health Review Commission. *See* 29 U.S.C. § 659(c) (2006); *see also id.* § 661 (establishing the Commission as a freestanding federal agency). After the Commission rules, either a "person adversely affected or aggrieved by an order of the Commission" or the Secretary of Labor may seek judicial review in an appropriate court of appeals. *See* 29 U.S.C. § 660(a)–(b). Second, as noted, section 11(c) expressly authorizes DOL to bring a civil action in federal district court when it determines that an "employer" has taken an unlawful retaliatory action against an "employee." *See id.* § 660(c)(2). It is this latter circumstance that is of present concern.

As your Opinion Request indicates, OSHA whistleblower litigation between DOL and USPS raises two distinct legal complications. First, it

---

[4] We reached a similar conclusion in a 1997 opinion construing the enforcement authorities of the Environmental Protection Agency ("EPA"). *See EPA Enforcement*, 21 Op. O.L.C. at 109. There, the initial statutory enactment "did not contain any language subjecting federal agencies to enforcement authority." *Id.* at 114. Congress then revised the statutory definition of "person" to include "any agency, department, or instrumentality of the United States." *Id.* (quoting statutory language). Against that backdrop, we concluded that Congress had "clearly indicated . . . its intent to authorize EPA to use its section 113 enforcement authorities against federal agencies." *Id.* at 115.

appears that Congress intended that DOL and USPS would litigate whistleblower disputes against one another, and yet it also vested the Attorney General with broad authority to control the litigation conduct of each agency. If possible, we should construe these potentially conflicting statutory commands to give effect to the language and purpose of each. *See generally Ricci v. DeStefano*, 129 S. Ct. 2658, 2674 (2009) (when confronted with conflicting statutory requirements, a court "must interpret the statute to give effect to both provisions where possible").

Second, because we conclude that Congress clearly intended to grant Article III courts authority to adjudicate suits of this kind between DOL and USPS, we must confront the constitutional question of whether an Article III court may validly exercise that authority. *See, e.g.*, *Authority of Department of Housing and Urban Development to Initiate Enforcement Actions Under the Fair Housing Act Against Other Executive Branch Agencies*, 18 Op. O.L.C. 101, 107 (1994) ("*HUD Enforcement*") (declining to address similar constitutional question upon concluding HUD did not have authority to "initiat[e] statutory enforcement proceedings that could result in judicial resolution of disputes between HUD and respondent executive branch agencies" where Congress did not expressly state that "the United States" could be a respondent in such actions); *EPA Enforcement*, 21 Op. O.L.C. at 115 (addressing similar constitutional questions only after concluding that Congress clearly intended to authorize enforcement against federal agencies).

## II.

Our analysis begins by addressing whether the Attorney General may authorize USPS to direct its own defense of the case you have described, and, if so, whether the exercise of that authority would raise concerns under the Appointments Clause.

## A.

We first conclude that the Attorney General has statutory authority, pursuant to 39 U.S.C. § 409(g)(2), to permit USPS to direct its own defense of the whistleblower suit that DOL has proposed to bring.

Section 409(g) begins, in paragraph (1), by setting out certain cases in which "legal representation may not be furnished by the Department of Justice to the Postal Service." These include suits under the Trademark

Act of 1946, certain antitrust claims, and unfair or deceptive acts or practices claims brought under section 5 of the Federal Trade Commission Act. *See id.* § 409(g)(1)(A) (barring representation in cases encompassed by section 409(d)–(e)). With respect to these suits, USPS "may, by contract or otherwise, employ attorneys to obtain any legal representation that it is precluded from obtaining from the Department of Justice under this paragraph." *Id.* § 409(g)(1). Section 409(g)(2) then sets out the following rule with respect to "any circumstance not covered by paragraph (1)":

> [T]he Department of Justice shall, under section 411, furnish the Postal Service such legal representation as it may require, *except that, with the prior consent of the Attorney General, the Postal Service may, in any such circumstance, employ attorneys by contract or otherwise to conduct litigation brought by or against the Postal Service or its officers or employees in matters affecting the Postal Service.*

*Id.* § 409(g)(2) (emphasis added).

Consistent with the Office's construction of a prior version of this provision, we conclude that section 409(g)(2) grants the Attorney General discretion to authorize USPS to conduct its own defense of a particular litigation, independent of the "full plenary authority" that the Attorney General customarily exercises over "all litigation, civil and criminal, to which the United States, its agencies, or departments, are parties." *The Attorney General's Role as Chief Litigator for the United States*, 6 Op. O.L.C. 47, 48 (1982) ("*Chief Litigator*"). That is, we think section 409(g)(2) grants to USPS a *conditional* independent litigating authority—USPS may litigate independently of the Attorney General's direction and control, but only where the Attorney General has given his "prior consent."

In the past, we reached the same conclusion in considering a prior version of the statute that similarly provided that the "Department of Justice shall furnish, under section 411 of this title, the Postal Service such legal representation as it may require, but with the prior consent of the Attorney General the Postal Service may employ attorneys by contract or otherwise to conduct litigation brought by or against the Postal Service." *See* 39 U.S.C. § 409(d) (1976). We first reached that conclusion in 1976, in the context of determining whether the Department could be reimbursed for expenses used to retain private attorneys to represent certain

Postal Service employees in connection with a congressional investigation. The issue arose following advice that the Attorney General had the authority to employ private attorneys to represent certain government employees in connection with congressional investigations where the Department was conducting criminal investigations of the same employees, and "representation of the individuals by Department attorneys would present an unacceptable appearance of conflict of interest, and create a substantial potential of prejudicing effective defense of the civil cases by required withdrawal of representation in the future." Memorandum for Glen E. Pommerening, Assistant Attorney General for Administration, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, *Re: Authority for Employment of Outside Legal Counsel* at 1 (Mar. 4, 1976).

We then considered whether the Department could obtain reimbursement from the agencies that employed the individuals for whom private representation had been provided—one of which was USPS. *See* Memorandum for Glen E. Pommerening, Assistant Attorney General for Administration, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, *Re: Employment of Outside Legal Counsel—Nature of Contracts; Reimbursement by Other Agencies* (Mar. 15, 1976) ("*Contracts and Reimbursement*"). Our analysis as to each agency turned on whether that agency had statutory authority to litigate independently of the Justice Department. With respect to the Central Intelligence Agency ("CIA"), for example, we concluded that because "the CIA has no authority to conduct or contract for representation in litigation, it cannot reimburse the Department for that activity. Or, viewed conversely, the duty to provide defense counsel for the employees and former employees of the CIA belongs exclusively to this Department, and must be supported from its funds." *Id*. at 13. We reached an analogous conclusion with respect to reimbursement from the Federal Bureau of Investigation ("FBI"): "Our examination of the authorization and appropriations statutes of the FBI reveals no express reference to the retention or compensation of counsel. Accordingly, we find no basis for obtaining reimbursement of defense attorneys' fees from the Bureau." *Id.* at 14.

We reached a different conclusion about USPS reimbursement, however, opining that under 39 U.S.C. § 409(d) (1976), "the Attorney General could have given his consent to an arrangement under which the Postal Service itself provided representation for its employees." *Id.* at 10. Be-

cause the Department had instead elected to furnish legal representation to the Postal Service employees, and because 39 U.S.C. § 411 expressly authorizes Executive agencies to "furnish property . . . and personal and nonpersonal service to the Postal Service . . . under such terms and conditions, including reimbursability, as the Postal Service and the head of the agency concerned shall deem appropriate," *id.*, we found that there was "clear" statutory authority for the Postal Service to reimburse the Justice Department for the costs of representation incurred in civil litigation. *Contracts and Reimbursement* at 10.

In 1980, a dispute arose between this Department and USPS about whether Congress had granted USPS independent litigating authority with respect to a narrow range of judicial proceedings between USPS and the Postal Rate Commission.[5] In that context, we again advised that the 1976 version of section 409(d) authorized the Attorney General to allow USPS to litigate independently of his supervision and control. Although we did not agree with USPS's contention that Congress had granted it independent litigating authority with respect to such suits, we advised that the Attorney General could put the dispute to rest by "exercis[ing] his prerogative under [section] 409(d) to remove himself from representation by consenting to representation by outside counsel." Memorandum for John H. Shenefield, Associate Attorney General, from Larry A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Representation of the Governors of the United States Postal Service* at 4 (Sept.

---

[5] In *Mail Order Association of America v. United States Postal Service,* 986 F.2d 509, 516 (D.C. Cir. 1993), the court of appeals concluded that USPS did have independent litigating authority with respect to that narrow category of disputes. The court also discussed in dicta the question of how section 409(d) should be interpreted as a general matter, suggesting that it "could be construed to give the Department of Justice a sort of 'right of first refusal' for Postal Service representation. The Postal Service would be required first to seek representation from the Department. If the Department declined, it would be expected . . . to consent to the Postal Service's self-representation." *Id.* at 516.

This suggestion contrasted with the Department's litigating position, which was that section 409(d) gave the Department "full discretion to furnish or withhold legal representation (in effect, to determine what legal representation the Postal Service 'may require'), and g[ave] the Attorney General full discretion to grant or withhold consent for the Postal Service to proceed on its own." *Id.* at 515. The court expressly declined to decide "which is the correct reading of § 409(d) generally," however, limiting its holding to the narrower question before it. *Id.* at 516. Both readings are compatible with our conclusion here that the Attorney General, at a minimum, has statutory discretion to allow USPS to represent itself in this litigation.

24, 1980). Or, as we put it in a related memorandum: "Although the Department of Justice has litigating authority for the Postal Service, there is a provision of the Postal Service laws, 39 U.S.C. § 409(d), that empowers [the Attorney General] to consent to the Postal Service's handling of its own case in court, either through its General Counsel or through contract." Memorandum for the Attorney General from Larry A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Postal Services Litigation* at 1 (Aug. 27, 1980).

We believe our prior opinions correctly understood 39 U.S.C. § 409(d) (1976) to grant the Attorney General discretion to authorize USPS to control its own litigation in a particular case, and we adopt the same construction of its modern successor, 39 U.S.C. § 409(g)(2) (2006). This conclusion is consonant with the test we have long applied to assess whether Congress has granted independent litigating authority to an agency: "In order to come within the 'as otherwise authorized by law' exception to the Attorney General's authority . . . it is necessary that Congress use language authorizing agencies to employ outside counsel (or to use their own attorneys) to represent them in court." *Chief Litigator*, 6 Op. O.L.C. at 56–57; *see also Case v. Bowles*, 327 U.S. 92, 96–97 (1946) (rejecting litigant's contention that a suit was improperly filed and litigated by officials outside the Justice Department, noting that the relevant statutory scheme "specifically empowers the [Emergency Price Control Act] Administrator to commence actions such as this one and authorizes attorneys employed by him to represent him in such actions").

Section 409(g)(2) plainly meets this standard. Provided that the Attorney General has given his "prior consent," the statute grants USPS express license to "employ attorneys by contract or otherwise to conduct litigation brought by or against the Postal Service or its officers or employees in matters affecting the Postal Service." 39 U.S.C. § 409(g)(2). We grant that section 409(g)(2) differs to a degree from more conventional grants of independent litigating authority, which typically give an agency unconditional authority to employ its own attorneys (or private attorneys) to litigate some or all of its cases. *See Chief Litigator*, 6 Op. O.L.C. at 56–57 & nn.12–14 (citing exemplary statutes, such as 29 U.S.C. § 154(a), which grants the National Labor Relations Board express authority to appoint attorneys to "appear for and represent the Board in any case in court"). But we see no basis to believe that Congress lacks the power to condition an agency's exercise of independent litigating authori-

ty on a judgment by the Attorney General that such independence would be appropriate in a particular case. To the contrary, that sort of structure is consistent with the basic premise that the litigation of the United States is, as a general matter, "subject to the direction, and within the control of, the Attorney-General." *The Confiscation Cases*, 74 U.S. (7 Wall.) 454, 459 (1868).

## B.

You also asked whether the Appointments Clause would preclude the Attorney General from "consent[ing] to USPS contracting with private counsel to conduct the litigation on USPS's behalf" in the case that DOL has proposed to file.[6] *See* Opinion Request at 10. We conclude that it would not.

You explained that your question was prompted by language in a 1990 opinion of this Office entitled *Constitutional Limits on "Contracting Out" Department of Justice Functions under OMB Circular A-76*, 14 Op. O.L.C. 94 (1990). In that opinion, responding to a request by the Justice Management Division for "general guidance" on limits that the Constitution may impose on the federal government's ability to contract out the performance of certain functions to private entities, *id.* at 95, we stated that "the authority to direct litigation on behalf of the United States may not be vested in persons who are not officers of the United States appointed in the proper manner under Article II, Section 2, Clause 2 of the Constitution." *Id.* at 100. As you observed, that statement is capable of being read as standing for the broad proposition that the Appointments Clause prohibits the Executive from "fully 'contracting out' litigation responsibility to private parties." Opinion Request at 11.[7]

---

[6] The Appointments Clause provides: "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

[7] At least one other opinion of this Office states this position expressly. *See Representation of the United States Sentencing Commission in Litigation*, 12 Op. O.L.C. 18, 26 (1988) ("as a general matter, a government agency cannot constitutionally delegate to a private party responsibility for the conduct of litigation in the name of the United States

At least since 1996, however, it has been clear that this Office does not find the requirements of that clause applicable when U.S. departments and agencies contract with private attorneys to provide legal representation in discrete matters. Over time, the Office has cited somewhat different reasons for reaching that conclusion, but has adhered to it steadfastly.

In 1996, we explained that "[t]he Appointments Clause simply is not implicated when significant authority is devolved upon non-federal actors." *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 145 (1996). Thus, we concluded that the "simple assignment of some duties" to private individuals, "even significant ones, does not by itself pose an Appointments Clause problem." *Id.* at 146. A subsequent opinion of the Office, while questioning the conclusion that the Appointments Clause *never* applies to individuals who are non-federal employees, nonetheless agreed that "'an engagement with a gentleman of the bar, whereby, for a valuable consideration, he is to render his professional services *in a given case*, is a contract, a bargain, an agreement, in the legal sense of these terms,' not an appointment to an office." *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 113 (2007) (quoting *Contracts with Members of Congress*, 2 Op. Att'y Gen. 38, 40 (1826) (referring to contracts "for the service of a lawyer, a physician, or a mail carrier, an army purveyor, or a turnpike-road maker")).

Our conclusion that the Appointments Clause does not apply when federal agencies employ private litigation counsel to handle a particular matter is supported by significant historical practice. We recognize that the conduct of litigation on behalf of the federal government is today concentrated in the Justice Department, as it has been since 1870, and that federal agencies are barred by statute from employing private litigation counsel, "[e]xcept as otherwise authorized by law." 5 U.S.C. § 3106 (2006). But early opinions of the Attorneys General reflect that prior to the creation of this Department, it was commonplace for federal agencies to hire private attorneys. *See, e.g.*, *Employment of Counsel*, 7 Op. Att'y Gen. 141, 141–42 (1855) ("According to the traditional practice of the Government, it has belonged to the attributes of any Head of Department to employ counsel in his discretion for the conduct of legal business

---

or one of its agencies," and "may not constitutionally entrust to a private party the formulation and presentation of its views on its own authority to a court").

arising in his department. The act of February 26th, 1853, for the regula-
tion of fees in the legal business of the Government, expressly recognises
the existence of this power in any Head of Department."); *Bryan's Case*,
10 Op. Att'y Gen. 40, 43 (1861) ("The purpose of this law [authorizing
heads of department to pay fees for legal counsel] is obvious. Legal
controversies often arise in which the Government is concerned; and
although the counsel authorized and required by law to represent the
Government in these controversies is the United States Attorney for the
proper district, it often happens that it is expedient to employ other
counsel in his aid, or in his place. . . . In such cases, the law allows the
head of the department, to which the business belongs, to employ and
pay counsel 'such sum as may be stipulated or agreed on.'"); *Employ-
ment of Counsel by a Department*, 12 Op. Att'y Gen. 368 (1868) (affirm-
ing statutory authority of the Secretary of War to employ special counsel
to represent a military officer in a habeas proceeding).

Even after consolidating the vast mass of federal government litigation
in this Department, moreover, Congress has on occasion carved out ex-
ceptions that expressly authorize federal agencies to employ private
counsel in specified circumstances, including for purposes of litigation.
*See Chief Litigator*, 6 Op. O.L.C. at 56 n.11 (noting authority of the
Secretary of Defense, pursuant to 10 U.S.C. § 1037, to "employ counsel,
and pay counsel fees, court costs, bail, and other expenses incident to the
representation, before the judicial tribunals and administrative agencies of
any foreign nation" of U.S. servicemembers and other specified individu-
als). In view of this longstanding practice, we do not think the Appoint-
ments Clause precludes a federal agency from entering into a contract
creating an ordinary attorney-client relationship with a private attorney to
handle an individual case.

### III.

We now turn to the Article III question posed by DOL's proposal to sue
USPS to enforce section 11(c) of OSHA. Section 2 of that Article "ex-
tends the 'judicial Power' of the United States only to 'Cases' and 'Con-
troversies,'" and thus to "cases and controversies of the sort traditionally
amenable to, and resolved by, the judicial process." *Steel Co. v. Citizens
for a Better Env't*, 523 U.S. 83, 102 (1998). A logical and long-accepted
corollary to that rule is that "no person may sue himself," because adjudi-
cating such a suit would require the court to engage in "the academic

pastime of rendering judgments in favor of persons against themselves." *United States v. ICC*, 337 U.S. 426, 430 (1949). This Office has concluded that this general rule applies to the federal government as well, and accordingly that it limits the authority of an Article III court to resolve legal disputes that arise between federal agencies. *See, e.g.*, *Proposed Tax Assessment Against the United States Postal Service*, 1 Op. O.L.C. 79 (1977) ("*Proposed Tax Assessment*") (opining that a dispute between the Internal Revenue Service ("IRS") and USPS over federal taxes owed by USPS would not be justiciable); *NRC Enforcement*, 13 Op. O.L.C. at 138 ("lawsuits between two federal agencies are not generally justiciable"); *HUD Enforcement*, 18 Op. O.L.C. at 106 (same).

As our opinions also reflect, however, the Supreme Court's decisions in *United States v. ICC* and *United States v. Nixon*, 418 U.S. 683 (1974), make clear that in certain circumstances, federal courts do have power to resolve an inter-agency legal dispute. *See, e.g.*, *Proposed Tax Assessment*, 1 Op. O.L.C. at 80–84; *NRC Enforcement*, 13 Op. O.L.C. at 138–41. For example, in *United States v. ICC*, the Supreme Court allowed a suit by the United States against an independent agency of the United States, the Interstate Commerce Commission ("ICC"), to go forward. In fact, owing to a statutory requirement that the United States be named as a party defendant in any suit against the ICC, the United States named *itself* as a defendant in its petition for relief. 337 U.S. at 429.[8] The Supreme Court nonetheless found, on the particular facts before it, that the dispute presented a justiciable controversy. The Court explained that the question of justiciability did not turn on formalities:

> While this case is United States v. United States, et al., it involves controversies of a type which are traditionally justiciable. The basic question is whether railroads have illegally exacted sums of money from the United States. Unless barred by the statute, the Government is not less entitled than any other shipper to invoke administrative and judicial protection. To collect the alleged illegal exactions from the railroads the United States instituted proceedings before the Interstate Commerce Commission. In pursuit of the same objective the Government challenged the legality of the Commission's action.

---

[8] The district court further noted that both the government's petition for relief and the answer filed by the United States had been "signed by the same Assistant Attorney General." *United States v. ICC*, 78 F. Supp. 580, 583 (D.D.C. 1948).

> This suit therefore is a step in proceedings to settle who is legally entitled to sums of money, the Government or the railroads. The order if valid would defeat the Government's claim to that money. But the Government charged that the order was issued arbitrarily and without substantial evidence. This charge alone would be enough to present a justiciable controversy. Consequently, the established principle that a person cannot create a justiciable controversy against himself has no application here.

*Id.* at 430–31 (citation omitted).

*United States v. Nixon* also presented, on very different facts, the question of the federal courts' constitutional authority to resolve an "intra-branch dispute." 418 U.S. at 693. The United States and the President of the United States found themselves on opposite sides of a suit, initiated by President Nixon, which sought to quash a subpoena issued at the request of a Justice Department Special Prosecutor. In this context, "the President's counsel argued that the court lacked jurisdiction to issue the subpoena because the matter was an intra-branch dispute between a subordinate and superior officer of the Executive Branch," and accordingly did not "present a 'case' or 'controversy' which can be adjudicated in the federal courts." *Id.* at 692. The Supreme Court rejected this argument, relying in significant part on its decision in *United States v. ICC.*

The Court first stated that "[t]he mere assertion of a claim of an 'intra-branch dispute,' without more, has never operated to defeat federal jurisdiction." *United States v. Nixon*, 418 U.S. at 693. It then instructed that "'courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented.'" *Id.* (quoting *United States v. ICC*, 337 U.S. at 430). The Court concluded that the issues at stake in the suit, principally "the production or nonproduction of specified evidence deemed by the Special Prosecutor to be relevant and admissible in a pending criminal case," were "'of a type which are traditionally justiciable.'" *Id.* at 697 (quoting *United States v. ICC*, 337 U.S. at 430). The Court further determined that Article III's requirement of "'concrete adverseness'" was satisfied, because "[t]he independent Special Prosecutor with his asserted need for the subpoenaed material in the underlying criminal prosecution is opposed by the President with his steadfast assertion of privilege against disclosure of the material." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). Finally, the Court stated that "since the matter is one arising in the regular course

of a federal criminal prosecution, it is within the traditional scope of Art. III power." *Id.* It therefore concluded that "the fact that both parties are officers of the Executive Branch cannot be viewed as a barrier to justiciability." *Id.*[9]

Our opinions describe *United States v. ICC* and *Nixon* as establishing that an intra-branch dispute will fall within the judicial power of an Article III court where "at a minimum . . . there [is] an issue of the kind traditionally viewed as justiciable, and also . . . there [is] sufficient adverseness to sharpen the issues." *Proposed Tax Assessment*, 1 Op. O.L.C. at 83. In considering the second prong of this test—adversity of parties—we have focused our analysis on two factors. First, we have viewed as relevant whether one of the agencies concerned "has a degree of independence from the executive branch," "like the Special Prosecutor in *Nixon* and the regulatory agenc[y] involved in *United States v.* [*ICC*]." *Id.* Second, we have indicated that there cannot be true adversity unless there is a nongovernmental real party in interest who has a stake in the outcome of litigation that is distinct from that of the public as a whole. *See id.* at 83–84 (concluding that a potential suit between USPS—an independent agency—and IRS over a tax assessment levied against USPS could not be adjudicated by an Article III court because there were no private parties with a distinct and concrete interest in the outcome of the dispute); *Ability of the Environmental Protection Agency to Sue Another Government Agency*, 9 Op. O.L.C. 99, 100 (1985) (advising that Article III "case or controversy" requirements may be satisfied in an intra-branch dispute

---

[9] Since *Nixon*, the Supreme Court has resolved several disputes between a traditional Executive Branch agency and an "independent" agency—the Federal Labor Relations Authority ("FLRA"). *See, e.g.*, *NASA v. FLRA*, 527 U.S. 229, 231 (1999) (holding that an investigator employed by NASA's Office of Inspector General is a "representative" of NASA for purposes of a statutory provision conferring a right to union representation during covered examinations); *IRS v. FLRA*, 494 U.S. 922, 924 (1990) (reviewing "the determination of the Federal Labor Relations Authority" that "the Internal Revenue Service must bargain with the National Treasury Employees Union over a proposed contract provision") (abbreviations omitted); *Fort Stewart Schs. v. FLRA*, 495 U.S. 641, 643 (1990) (reviewing dispute concerning scope of statutory collective bargaining obligations between schools "owned and operated by the United States Army" and the FLRA); *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 90–91 (1983) (addressing challenge by the Bureau of Alcohol, Tobacco and Firearms to FLRA's construction of statute that would have required the Bureau to pay certain expenses to employees engaged in collective bargaining). The Court did not, however, discuss in any of these cases whether the suit was justiciable.

only if "the real party in interest challenging the Executive's position in court" is not "an agency of the Executive" (quotations omitted)); *NRC Enforcement*, 13 Op. O.L.C. at 141 (concluding that a potential lawsuit between the Air Force and the Nuclear Regulatory Commission—an independent agency—would not be justiciable because "the [Nuclear Regulatory Commission] and the Air Force would be the real parties in interest in the lawsuit").

Under this standard, we conclude that a court would have authority under Article III to resolve the proposed suit. As we understand it, DOL's claim would be that USPS violated its statutory obligation not to "discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [OSHA]." 29 U.S.C. § 660(c)(1). Courts routinely resolve claims arising under this and other provisions of law that protect whistleblowers from retaliatory discharge. Accordingly, we believe that the suit would involve "an issue of the kind traditionally viewed as justiciable," *Proposed Tax Assessment*, 1 Op. O.L.C. at 83. *See United States v. ICC*, 337 U.S. at 431 (finding justiciable the question whether the ICC's order had been "issued arbitrarily and without substantial evidence"); *United States v. Nixon*, 418 U.S. at 696–97 (finding justiciable the question whether the Special Prosecutor's subpoena should be quashed).

We also conclude that this potential lawsuit would satisfy both aspects of the "concrete adverseness" prong of our standard. First, USPS plainly has a "degree of independence" from the Executive branch. USPS is an "independent establishment of the executive branch," 39 U.S.C. § 201, and nine of the eleven voting members of its Board of Governors are subject to removal by the President "only for cause." *See id.* § 202(a)(1). As an independent agency with a tenure-protected governing board, USPS thus possesses some "degree of independence from the executive branch." *See generally Buckley v. Valeo*, 424 U.S. 1, 133 (1976) (per curiam) (describing such agencies as "independent of the Executive in their day-to-day operations"). Second, we think the former USPS employee who DOL believes was unlawfully terminated would be a "private real party in interest" in this litigation, because she would be entitled to receive an individualized remedy for the harm allegedly done to her by USPS if DOL prevails in the litigation. As the result of a suit brought by DOL, the district court could enter judgment ordering the "rehiring or reinstatement

of the employee to [her] former position with back pay." *See* 29 U.S.C. § 660(c)(2). The district court also has authority under that provision to "order all appropriate relief," *id.*, a phrase that courts have interpreted to encompass both compensatory and punitive damages. *See, e.g.*, *Reich v. Cambridgeport Air Sys., Inc.*, 26 F.3d 1187, 1190–94 (1st Cir. 1994); *Reich v. Skyline Terrace, Inc.*, 977 F. Supp. 1141, 1147 (N.D. Okla. 1997). These possible remedies give the former USPS employee the kind of specific, individualized interest in the outcome of the suit that is generally viewed as sufficient to make an inter-agency dispute justiciable in an Article III court. *See, e.g.*, *NRC Enforcement*, 13 Op. O.L.C. at 140–41 (describing cases involving a private real party in interest). We therefore conclude that the proposed suit would be justiciable under our traditional standard.

We acknowledge support in the case law for the view that our traditional test is too restrictive, specifically that there need not be a "private real party in interest" in all circumstances for an Article III court to have the authority to adjudicate an inter-agency dispute. For example, both the D.C. Circuit and the Eleventh Circuit found inter-agency suits justiciable without resting their judgments on the presence of a private real party in interest. *See United States v. Fed. Mar. Comm'n*, 694 F.2d 793, 810 (D.C. Cir. 1982); *Tenn. Valley Auth. v. EPA*, 278 F.3d 1184, 1196–98 (11th Cir. 2002). In fact, the D.C. Circuit "[a]ssum[ed] arguendo that the real parties in interest are the Department [of Justice] and the [Federal Maritime] Commission," and concluded, nevertheless, that the suit was justiciable under Article III because it "raises issues that courts traditionally resolve and the setting assures the concrete adverseness on which sharpened presentation of the issues is thought to depend." *Fed. Mar. Comm'n*, 694 F.2d at 810.[10] The reasoning of these opinions seems to be in significant tension with our long-held view that a private real party in interest must be present if an Article III court is to adjudicate an inter-

---

[10] More recently, the concurring opinion in *SEC v. FLRA*, 568 F.3d 990, 997 (D.C. Cir. 2009) (Kavanaugh, J.), noted the "anomaly" of the fact that "[b]oth the [Securities and Exchange Commission] and the FLRA are agencies in the Executive Branch, yet one is suing the other in an Article III court." *Id.* Judge Kavanaugh opined that the suit was within the authority of an Article III court because "this case involves a so-called independent agency." *Id.* Observing that such agencies "typically operate with some (undefined) degree of substantive autonomy from the President," he concluded that "an independent agency therefore can be sufficiently adverse to a traditional executive agency to create a justiciable case." *Id.*

agency suit. But in light of our conclusion that the former USPS employee would be a private real party in interest in this proposed suit, we need not consider whether to revisit our view here.

## IV.

We conclude that the Attorney General has authority under 39 U.S.C. § 409(g)(2) to allow USPS to direct its own defense of this case, that the exercise of this authority would not violate the Appointments Clause, and that, if the Attorney General opts to allow USPS to direct its own defense, there would be no constitutional bar to the adjudication of this dispute by an Article III court.

VIRGINIA A. SEITZ
*Assistant Attorney General*
*Office of Legal Counsel*